**Larry S. YOUNG, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. A. No. 86–0064–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

Sept. 30, 1986.

Robert E. Pembleton, Thomas T. Hassell, Jr., Richmond, Va., for plaintiff.

Debra J. Prillaman, Asst. U.S. Atty., Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

### Procedural History

This suit was brought by Larry S. Young against the United States on January 28, 1986, under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–80, claiming that the medical personnel at McGuire Veterans Administration Medical Center (VAMC) negligently performed an operation on Mr. Young's ankle and thereby caused him permanent nerve damage. The defendant, in its answer, alleged that plaintiff's injuries were not proximately caused by any negligence on the part of defendant's agents or employees and further alleged that plaintiff had assumed the risks of treatment out of which his injuries arose. Depositions were taken of Dr. William K. Fleming, Dr. Kenneth I. Kiluk, Jr., Dr. Ben R. Allen, Jr., and Larry S. and Beverly H. Young. A trial of this action was held on September 8, 1986, at which time these depositions were admitted into evidence. Both plaintiff and defendant presented argument and evidence, and the case is now ripe for disposition.

## Jurisdiction

Jurisdiction is premised on 28 U.S.C. § 1346(b), which confers exclusive jurisdiction on the federal district courts over civil suits for money damages against the United States based on personal injuries caused by the negligence of government employees.

## Facts

Mr. Young is a thirty-eight year old male who injured his left ankle in a mine explosion in Vietnam in 1969. Mr. Young first came to the VAMC on August 22, 1984, complaining of swelling and drainage from his left lower leg which he had suffered for the preceding year. After his initial visit, he received outpatient antibiotic treatment at the VAMC without success. Based on X-rays and a culture of pus in Young's ankle, VAMC personnel recommended his admission for surgery to incise and debride the infected ankle.

Upon Mr. Young's hospital admission on September 24, 1984, L.P. Levin, M.D., an orthopedic resident, examined him and recommended incision and debridement in the treatment plan given to William F. Fleming, M.D., a staff orthopedic surgeon. Dr. Fleming approved the plan and discussed the surgery either with Dr. Levin or with Dr. Mark Jobe, another resident. Dr. Walls, also a hospital resident, obtained Mr. Young's consent on a form authorizing the surgical procedure to be performed by or under the direction of Dr. Fleming.

Since Dr. Fleming knew Mr. Young's surgery was a relatively uncomplicated procedure and was aware of the surgical experience of Drs. Jobe and Levin, Dr. Fleming did not perform the surgery, although he was available in the hospital if assistance was needed. Dr. Jobe was an orthopedic surgical resident who had been licensed to practice medicine in Massachusetts for two years and had just been licensed to practice in Virginia. He had performed numerous surgical procedures on the lower extremities, many of which involved use of a tourniquet. Dr. Jobe performed the surgery on Mr. Young, with Dr. Levin assisting.

Prior to the surgery, Mr. Young's left thigh was padded, a tourniquet was applied somewhere between his left knee and hip, and his leg was elevated to prevent blood flow to the ankle area during surgery. Either Dr. Jobe or Dr. Levin ordered the pneumatic tourniquet to be inflated to 350 millimeters, as was done by Mary Jackson, the VAMC nurse anesthetist for Mr. Young's operation. Ms. Jackson also administered spinal anesthesia to Mr. Young. According to reports made by Ms. Jackson and by Cheryl Rice, circulating nurse, Mr. Young's leg was elevated for the relatively short period of twenty-four minutes. Dr. Jobe made an incision over the left ankle, excised the sinus tract, cleaned out the infected tissue and bone, irrigated the cavity, removed a BB-sized piece of shrapnel from the bone, and packed it with gauze. Ms. Rice recorded that the procedure went well, and neither Dr. Jobe nor Ms. Jackson recalled any difficulties with the operation.

The day after surgery, Mr. Young complained of decreased sensation in the dorsomedial aspect of the left foot and lower leg. Mr. Young was placed on antibiotics, received wound care and remained in the hospital until October 10, 1984. When he was discharged, he was told to return to the orthopedic clinic for follow-up care.

On December 19, 1984, Mr. Young reported decreased sensation on the dorsum of his foot, laterally. Based upon an electromyelogram and nerve conduction study performed at the VAMC clinic in December 1984, Mr. Young was diagnosed to have left common peroneal nerve palsy at the knee level.

Mr. Young subsequently discontinued treatment at the VAMC. Since April 1985, Kenneth I. Kiluk, M.D., a neurosurgeon, has been Mr. Young's primary physician. Dr. Kiluk has diagnosed Mr. Young to have reflex sympathetic dystrophy, which he initially treated with physical therapy and psychological counselling at the Pain Clinic. In January-February 1986, a dorsal column stimulator was implanted in Mr. Young's side to attempt to block the pain impulses,

and Mr. Young reports that it has reduced his pain level.

Before his hospitalization at the VAMC, Mr. Young was employed at the Defense General Supply Center, but he has not worked since his hospitalization in September 1984.

*The Merits*

Plaintiff alleges that the United States is liable under the Federal Tort Claims Act because it negligently performed ankle surgery on Mr. Young. Under the Tort Claims Act, the government's liability is determined under the law of the place where the alleged act or omission occurred, in the instant case, Virginia. *See Corrigan v. United States*, 609 F.Supp. 720 (E.D.Va. 1985). In order to prevail, plaintiff bears the burden of proving by a preponderance of the evidence that defendant breached the standard of care in Virginia and that such breach was the proximate cause of Mr. Young's nerve damage. *See, e.g., Fitzgerald v. Manning*, 679 F.2d 341, 346 (4th Cir.1982). Plaintiff offers several possible theories of negligence, but he has not met his burden of proof under any of these theories.

1. *Application of Res Ipsa Loquitur*

Plaintiff's first and primary contention is that this case is closely analogous to *Danville Community Hospital, Inc. v. Thompson*, 186 Va. 746, 43 S.E.2d 882 (1947), in which the Virginia Supreme Court applied the doctrine of *res ipsa loquitur* to a medical malpractice case. Based on *Danville*, plaintiff argues that the *res ipsa* doctrine should be applied to provide an inference of negligence, shifting the burden to the defendant to explain the cause of Mr. Young's injury.

The instant case, however, is not appropriate for the application of *res ipsa* under the criteria outlined in *Danville*. In *Danville*, the court upheld a jury verdict finding a hospital liable for negligent treatment of a newborn infant. Medical personnel testified that the newborn was delivered and placed in a warming bassinet without injury, but that the next day, after a hot water bottle had been applied, the newborn was blistered from a burn. While no one could testify to the exact cause of the injury, the newborn's physician testified that such a burn would not have occurred with proper use of the hot water bottle and that use of the bassinet was unlikely to have caused the burn.

The court held that where the defendant had "presented no evidence to show that it exercised any care at all ... [and] offered no explanation of how the burn occurred," the jury was properly instructed that it might infer the newborn's injury was due to defendant's negligence. *Danville, supra*, 186 Va. at 757, 43 S.E.2d at 886. The court provided three criteria as prerequisites to the application of the *res ipsa* doctrine: (1) the instrumentality causing the injury was in the exclusive possession and control of the defendants; (2) the defendants have exclusive knowledge of the way in which the instrumentality was used; and (3) injury would not ordinarily have occurred if it had been properly used. *Danville, supra*, 186 Va. at 745–46, 43 S.E.2d at 887.

Thus, proof by the plaintiff that the accident or injury probably would not have occurred but for the defendant's negligence is an essential element for the application of *res ipsa*. In *Danville*, the court explicitly recognized its prior holdings that the doctrine often is inapplicable to medical malpractice cases, where a bad result frequently occurs without any negligence. *Danville, supra*, 186 Va. at 746, 43 S.E.2d at 887.

■ Mr. Young's case does not meet the required criteria for application of *res ipsa* because plaintiff has failed to show that his reflex sympathetic dystrophy would not ordinarily have occurred but for the defendant's negligence. Both Drs. Kiluk and Allen, whose depositions were offered by plaintiff in support of his claim, stated that they could not ascertain the cause of plaintiff's injury, nor could they opine that his injury was caused by any negligence. *See, e.g.,* Kiluk Dep. at 16 ("I am dealing with a

problem here that could have come from anything, proper, improper, whatever and I have no way to tell what was done there, nor cannot say anything was proper or improper at the time."); Allen Dep. at 26 ("I have no information that would indicate there was any probability of neglect or malpractice ... from agents of the Veteran's Administration Hospital or the United States government...."). William D. Henceroth, M.D., an orthopedic surgeon who testified as defendant's expert, testified at trial that, in his medical opinion, Mr. Young's injury was caused by tourniquet palsy, a rare injury caused by use of a tourniquet, despite the tourniquet's proper application, pressurization and length of use. Dr. Henceroth further testified that one's propensity to suffer such injury cannot be predicted and that Mr. Young's history presented no contraindications for use of a tourniquet. Thus, the medical testimony is without conflict that Mr. Young's injuries may have occurred without any negligence on the part of VAMC personnel, and the doctrine of *res ipsa* is inapplicable.

■ Even were the doctrine of *res ipsa* to apply to Mr. Young's case, *Danville* provides that the doctrine merely creates an inference in favor of the plaintiff in the absence of any explanation by the defendant. *Danville, supra*, 186 Va. at 760, 43 S.E.2d at 888. In *Danville*, an inference arose because the "defendant presented *no evidence* to show that it exercised any care at all in handling the baby." *Danville, supra*, 186 Va. at 757, 43 S.E.2d at 886 (emphasis added).

By contrast, the United States did provide an explanation for Mr. Young's injuries through Dr. Henceroth's testimony that tourniquet palsy, a rare condition arising from *proper* use of a tourniquet, was the cause of plaintiff's injuries. Dr. Henceroth's testimony also provided evidence that defendant had exercised due care in performing the operation. Dr. Henceroth concluded that the tourniquet was applied to a proper location, was inflated to an appropriate pressure, and that Mr. Young's leg was elevated for an appropriate, in fact,

short, period of time. Dr. Allen concurred that the exact placement on the thigh would not be a determinative factor in causing injury and that, in fact, placement of the tourniquet on the thigh rather than below the knee would be "much more acceptable." Allen Dep. at 10. Dr. Allen also stated that tourniquet pressure of 350 millimeters for twenty-four minutes would be "within acceptable parameters of the use of a tourniquet." *Id.* at 31.

Thus, unlike the *Danville* case, here the defendant has provided an explanation for the injury and has provided evidence that it exercised due care in Mr. Young's surgery, thereby rebutting any inference of negligence and forcing the plaintiff to prove negligence. *See Danville, supra*, 186 Va. at 759, 43 S.E.2d at 888.

### 2. *Traditional Negligence Analysis*

In order to recover, plaintiff was required to prove the standard of care owed by the defendant in its treatment of the plaintiff, that such standard was breached, that this breach was the proximate cause of his injuries, and that he sustained damages. *See Fitzgerald, supra*, 679 F.2d at 346–47. Plaintiff has failed to prove any breach of a standard of care proximately causing his injuries.

#### a. *Breach of the Standard of Care.*

The plaintiff is required to produce testimony of medical experts in the same area of practice as the defendant concerning the standard of care to which physicians are held responsible in the community. *Morgan v. Schlanger*, 374 F.2d 235 (4th Cir.1967).

Plaintiff appears to allege three possible areas in which the defendant has deviated from the standard of care: (1) absence of the attending physician in the operating room; (2) use of the tourniquet; (3) lack of informed consent authorizing operation by the residents, rather than Dr. Fleming. However, he has failed to establish a breach of the relevant standard of care in any of these areas.

### (1) *Absence of Attending Physician*

■ Plaintiff makes much of the fact that his attending physician, Dr. Fleming, was not present in the operating room during plaintiff's operation. However, plaintiff has failed to prove that Dr. Fleming's absence breached the standard of care under the circumstances.

Dr. Henceroth testified that in Richmond-area teaching hospitals the attending physician often is absent during relatively uncomplicated surgeries such as Mr. Young's, although such practice is not common in area non-teaching hospitals. Mere evidence of area custom, however, does not establish the standard of due medical care. *See Nardini v. Gilbert,* 260 F.2d 177 (4th Cir.1958). In the instant case, there is no evidence that the standard of care requires the attending physician's presence in the operating room, but merely that such custom is followed in some hospitals. Thus, plaintiff has failed to prove that Dr. Fleming's absence breached any duty owed by defendant to the plaintiff.

### (2) *Use of the Tourniquet*

■ Plaintiff appears to argue negligence on two fronts concerning the use of the tourniquet. First, he contends that use of a tourniquet in and of itself constituted negligence. As support for this contention, he offers deposition testimony by Drs. Allen and Kiluk that they do not use tourniquets in their neurosurgical practices.

Such evidence is insufficient either to establish the relevant standard of care or to establish negligence. In order to establish the standard of care in a specialty, such as orthopedic surgery, the plaintiff must present expert testimony of individuals who are familiar with the degree of skill and care employed by reasonably prudent practitioners in that specialty. *See, e.g., Fitzgerald, supra,* 679 F.2d at 347; *Little v. Cross,* 217 Va. 71, 225 S.E.2d 387 (1976). Drs. Allen and Kiluk were unable to provide such testimony, as they testified they were unfamiliar with proper standards in orthopedic surgery. Even were they competent to testify to the standard of care, their testimony that they might have acted differently than the defendant, while stating that they found nothing improper in defendant's use of a tourniquet, provides no proof of negligence. *See Nardini v. Gilbert,* 260 F.2d 177, 178 (4th Cir.1958) (directed verdict for defendant where expert surgeons testified that they would have performed operation differently, but did not testify that defendants acted negligently or improperly). Therefore, the Court finds that the defendant was not negligent in using a tourniquet during plaintiff's surgery.

■ Plaintiff's second contention is that defendant used the tourniquet negligently, either by improper positioning or pressurization, or by use of a defective pressure gauge. This contention, too, is unsupported by the evidence.

Drs. Allen, Kiluk and Henceroth agree that improper placement of a tourniquet, over-inflation of the tourniquet pressure, or an extended period of elevation could cause injuries of the type suffered by the plaintiff. While the evidence did not establish the standard of care for placement, pressurization or elevation of a tourniquet, the medical testimony is uncontradicted in the instant case that the tourniquet was positioned properly, inflated to an appropriate pressure, and elevated for a short period of time. Thus, the plaintiff has failed to produce even a scintilla of evidence that the defendant was negligent in its use of the tourniquet.

The plaintiff further contends that defendant may have negligently used a defective pressure gauge on the tourniquet used in his operation. The evidence, however, belies this contention. Mr. Jenkins, a VAMC Work Leader in charge of equipment repair, testified that no complaints were registered concerning any of the operating room tourniquets and that all of the tourniquets were calibrated in 1986 and found to be accurate. Thus, there is simply no evidence that plaintiff's injuries could have been caused by a defective tourniquet gauge.

### (3) *Informed Consent*

█ Finally, plaintiff alleges that defendant negligently failed to obtain informed consent from Mr. Young to perform the operation. In order to prevail on such a theory in Virginia, plaintiff must prove by expert medical testimony that the defendant breached the duty of due medical care in the community regarding disclosure. *Bly v. Rhoads,* 216 Va. 645, 649–52, 222 S.E.2d 783, 787–88 (1976).

Plaintiff has failed to produce any expert testimony that, under the prevailing medical standard, physicians are required to disclose that the attending physician may not be present in the operating room during the proposed surgery prior to obtaining the patient's consent. In fact, the only evidence on this issue showed that such information normally is not disclosed. Therefore, plaintiff has failed to prove the standard of care or any breach thereof concerning the consent given in the instant case.

### b. *Proximate Cause.*

█ Even assuming that plaintiff provided adequate proof that defendant breached the standard of care due to the absence of an attending physician in the operating room or failure to obtain informed consent, plaintiff has not proved that such breaches were the proximate cause of Mr. Young's injuries.

Where there are a number of possible causes for plaintiff's disability, as in Mr. Young's case, the evidence must show that it is more likely or probable that the defendant's negligence was the cause than that other possible causes were responsible. *Fitzgerald, supra,* 679 F.2d at 348–49.

Mr. Young has produced no evidence that Dr. Fleming's absence from the operating room was even a factor contributing to plaintiff's harm, much less the proximate cause. When plaintiff's counsel was questioned concerning this causal connection, he merely stated that he felt the result might have been different if Dr. Fleming had been in attendance. Certainly,

such unsupported contention is inadequate to prove proximate causation.

Even if defendant were negligent in failing to inform plaintiff that Dr. Fleming might not be in the operating room during his surgery, plaintiff has failed to show the necessary causal connection between this breach and plaintiff's injuries. In a failure to disclose case, plaintiff must prove that if the physician had made disclosure, the reasonably prudent person in plaintiff's position would not have consented to treatment. *Dessi v. United States,* 489 F.Supp. 722, 728–29 (E.D.Va.1980). Under this standard, the Court must objectively weigh the necessity for the operation against the risk revealed by the disclosure, and it may consider plaintiff's testimony. *Dessi, supra,* 489 F.Supp. at 729.

In the instant case, there is no evidence that Dr. Fleming's absence posed any additional risk to the plaintiff. There is evidence, however, that plaintiff was in considerable discomfort and that the surgery was necessary, rather than elective. Further, plaintiff himself testified only that he would like to have known that Dr. Fleming would be absent, but not that such disclosure would have caused him to refuse the operation. Thus, plaintiff has failed to establish that defendant's failure to disclose even remotely contributed to his injuries.

### *Conclusion*

In sum, plaintiff has produced no concrete evidence that defendant or any of its agents or employees breached any standard of care in their treatment of Mr. Young. While plaintiff argues for the application of the doctrine of *res ipsa loquitur* to create an inference of negligence under the *Danville* rationale, the instant case does not meet the standards for application of the doctrine. Not only has plaintiff failed to show that plaintiff's injuries would not ordinarily occur without negligence, but even were the doctrine of *res ipsa* to apply, Dr. Henceroth provided an adequate explanation to account for Mr. Young's injury which would rebut any inference of negligence.

Under traditional negligence analysis, plaintiff has failed to produce any evidence that defendant breached the community standard of care in its treatment of plaintiff by its use or method of use of a tourniquet. Even assuming that defendant breached its duty by Dr. Fleming's absence from the operating room, there is no evidence that such breach bore any causal connection to plaintiff's injuries. Thus, plaintiff has failed to prove by a preponderance of the evidence that defendant was negligent in any respect in its treatment of Mr. Young or that any such negligence was the proximate cause of Mr. Young's injuries. Without such proof, plaintiff cannot prevail. While this Court regrets Mr. Young's unfortunate injuries, the defendant correctly states that a plaintiff may not recover for an unfortunate result without proof that such result was more probably than not caused by the defendant.

For the foregoing reasons, judgment will be entered for the defendant. An appropriate order shall issue.